UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

IN RE:

JEREMEY C. ROY                                                    CASE NO. 15-51217

DEBTOR

HIJ INDUSTRIES, INC., *formerly known as*                         PLAINTIFF
*JOMCO, INC.*

V.                                                                ADV. NO. 15-5084

JEREMEY C. ROY                                                    DEFENDANT

## MEMORANDUM OPINION AND
## ORDER DENYING MOTION TO REOPEN PROOF

       This matter is before the Court following the conclusion of a trial on the merits of the causes of action that Plaintiff HIJ Industries, Inc., formerly known as JOMCO, Inc.,[1] asserted against Debtor/Defendant Jeremey C. Roy, seeking to bar Debtor's discharge under § 727(a)(2) and/or to except HIJ's claims from Debtor's discharge under § 523(a)(6).[2]   Both Plaintiff and Debtor appeared at trial and were represented by counsel.   Having heard the evidence, the Court finds HIJ did not satisfy its burden to prove an entitlement to relief on its claims.   In addition, the Court denies HIJ's motion to reopen proof filed on October 10, 2016.   [ECF No. 119.]

---

[1] JOMCO, Inc. changed its name to HIJ Industries, Inc. on December 15, 2009.   To eliminate confusion, all further references to the Plaintiff herein will be to HIJ.

[2] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. References to the Federal Rules of Bankruptcy Procedure appear as "Bankruptcy Rule ___," and references to the Federal Rules of Civil Procedure appear as "Civil Rule __."

## **FACTUAL BACKGROUND**

The parties stipulated to many facts relating to HIJ's claims, rendering them undisputed for purposes of the trial.   [ECF No. 99.]   The following recitation derives from the stipulations, testimony and evidence presented at trial.

A.     **The Sale of HIJ's Business to EMS, and EMS's Subsequent Collapse.**

HIJ's principal, Jeffrey O'Brien, formed HIJ in 1990.   HIJ operated a fabrication and machining shop ultimately located in Versailles, Kentucky.   HIJ made custom-built machinery; essentially, HIJ built machines that made machines to be used in factories.   Mr. O'Brien testified that HIJ had gross sales in a wide range, varying from $350,000 to $525,000, in the last several years that he owned the business.   He also testified that HIJ had a history of strong annual earnings under his leadership.

Mr. O'Brien decided that he wanted to sell his business in 2007, and so he had the company appraised and engaged a business broker to help him find a buyer.   The broker brought several potential purchasers to Mr. O'Brien, including both Debtor and non-party Robert Fleming, a journeyman with a certificate in tool-making and on-the-job training as a junior engineer.   Neither Debtor nor Mr. Fleming had the expertise or financial wherewithal to acquire the business by himself.

Debtor Jeremey Roy holds a Master's Degree in Business Administration and is a Certified Management Accountant.   When he first investigated acquiring HIJ in or around early 2008, Debtor had worked for several employers as an accountant and was interested in becoming his own boss.   He also wanted to own a company to help finance the education of his three small children.   Debtor found the opportunity to acquire HIJ online and had interest, in part, because it was located close to his home in Lexington, Kentucky.   Debtor did not attempt to acquire HIJ initially because he thought it unlikely that he could run the business (he had no manufacturing

2

experience) or obtain financing.   Months later, another broker introduced Debtor to Mr. Fleming

to explore whether they could acquire HIJ's business together as business partners.   Mr.

Fleming had experience in the operational aspects of the machining business, while Debtor had

the expertise to handle accounting and related financial matters.

On November 11, 2009, Debtor formed Elite Machining Services, LLC ("EMS") for the

purpose of purchasing HIJ's assets.   Debtor held a 65% membership interest in EMS and Mr.

Fleming owned the remaining 35% interest.   On December 11, 2009, EMS purchased HIJ's

assets (the "Assets") for a total of $855,000 (the "Purchase Price") via an Asset Purchase

Agreement (the "Agreement").   The Assets included furniture, fixtures, and equipment, valued

at $150,000, and tooling valued at $50,000.   Mr. Roy contributed $70,000 in cash toward the

Purchase Price.   EMS funded most of the Purchase Price, $641,500, via a small business

association ("SBA") loan serviced by Huntington National Bank ("HNB").   EMS issued two

promissory notes to HIJ to pay the remainder of the Purchase Price, one for $42,000 and another

for $131,500 (the "Notes").   Debtor personally guaranteed the SBA loan and both Notes.

EMS continued HIJ's business after acquiring the Assets.   Mr. Fleming ran EMS's day-

to-day operations, including making bids, managing labor, buying materials, and making

product, while Debtor, who maintained other employment, handled bookkeeping and invoicing

for EMS.   Mr. Roy and Mr. Fleming were EMS's only officers.

HIJ introduced evidence regarding executive compensation at EMS.   The EMS tax

returns for 2010 and 2011 reflect that officer salaries increased from $89,000 in 2010 to about

$117,000 in 2011, even though revenue decreased in that time frame.   When asked about this

fact, Debtor explained that he and Mr. Fleming did not look at the EMS financials when setting

their salaries because Mr. Fleming expected the business to grow substantially.   Debtor stated

"Rob told me how much he needed to make, so that's how we set the salary."   Debtor testified

3

that Mr. Fleming earned a salary of about $80,000 and his own salary was roughly $30,000 to

$35,000.   Debtor also testified that distributions were made to officers in 2010 because EMS

had cash at the time to make the distributions.

The Agreement required Mr. O'Brien to provide training and consulting services to EMS

after the acquisition.   Mr. O'Brien introduced Mr. Fleming to customers post-acquisition.   Mr.

O'Brien also worked at EMS for about a month and a half after the transition, until Mr. Fleming

told Mr. O'Brien that his services no longer were required.   While he provided the consulting

services, Mr. O'Brien perceived that Mr. Fleming and Debtor were not receptive to his critiques.

Debtor testified that problems arose at EMS almost immediately after it took over HIJ's

business.   Within a few weeks after the acquisition, HIJ's primary customer, United Glass,

stopped sending business to EMS.   Debtor and William Dray, a long-time employee for HIJ

who then worked for EMS, described United Glass as providing 50-80% of HIJ's business; Mr.

O'Brien called United Glass a "very big customer."   Debtor was told that United Glass had

moved its production work from Versailles, Kentucky to another location and thus no longer

needed EMS's services.   Mr. O'Brien stated that he did not know that United Glass was going to

stop sending work to EMS within weeks of the asset sale.   Not only did United Glass stop

ordering from EMS, it also failed to pay a significant receivable to EMS for about 75-90 days,

which adversely affected EMS's cash flow.

When EMS management asked Mr. O'Brien about declining sales with United Glass, Mr.

O'Brien advised them to "pick up the phone and ask what's going on."   EMS management also

asked Mr. O'Brien to call another customer with falling sales, but the customer refused to speak

with him.   Debtor stated that, in addition to these problems, another EMS customer failed to pay

on its account, and EMS never was able to collect on that receivable.

When EMS became desperate for work with the loss of United Glass's business, it tried to procure work as a bulk parts manufacturer even though HIJ historically had operated as a custom parts business.   According to Debtor, the decision to take on large, bulk projects required EMS to devote significant cash to buy raw materials.   Mr. O'Brien testified that margins are high in custom manufacturing, whereas bulk manufacturers must have a high-volume business to make money.   Mr. O'Brien questioned the swift change in the business model, but offered no evidence to support his view that the decision to make the change somehow was nefarious.

As time progressed, the problems worsened for EMS.   Although Mr. Fleming's role was to handle operations, he fell ill for a long period and could not work.   While Debtor had procured disability insurance for this possibility, the policy lapsed, resulting in a significant set-back for EMS.   In addition, Debtor testified that Mr. Fleming purchased equipment for EMS with cash without consulting him, which further hindered the business and EMS's liquidity.

HIJ explored numerous alternatives to address its financial challenges.   Debtor left a full-time position with Nestle so that EMS could bid for work from Nestle, as discussed below. In 2011, Debtor searched for new investors or a potential purchaser for EMS to no avail.   In July 2011, Debtor met with a bankruptcy attorney to explore the viability of EMS filing bankruptcy and/or reorganizing, but EMS did not have the funds necessary to go through the bankruptcy process.   In August or September 2011, Debtor contacted Second Wind Consulting, a company that specializes in debt restructuring, turnaround consulting, and capital formation.   EMS retained Second Wind Consulting to help negotiate a settlement on the default of its SBA loan, as Debtor could not see a way for EMS to continue in business.   In September 2011, EMS defaulted on its SBA loan and the Notes.

While EMS made payments to HIJ on the smaller Note, it never made payments on the

bigger Note.   The last Note payment to HIJ came in September 2011 and, in October 2011, Mr.

O'Brien was told that no further payments would be made on the Notes, though he never was

asked about whether there was a way to work out another payment plan.

**B.      Other Corporate Activity Involving Debtor.**

After EMS's customer base began to erode, Debtor saw an opportunity for EMS to bid on

work for Nestle, his then-current employer; however, EMS could not bid on such work while

Debtor remained a Nestle employee.   To enable EMS to bid on Nestle work, Debtor resigned

from his job as the Head of Factory Finance at Nestle, which paid about $130,000 per year, and

found employment as an accounting manager with Precision Castparts in West Virginia.   Debtor

commuted from Lexington, Kentucky, each week for this job.

Debtor met fellow Precision Castparts employees Jim Dome and William O'Rourke upon

taking his new job, and they decided to go into business together.   Debtor found an opportunity

on the internet to acquire the assets of a company in Dayton, Ohio, that manufactured forklift

components, brake rotors, cylinder components, and master cylinders.   The business purchased

parts that EMS sold.   Mr. O'Rourke, who conducted the due diligence, believed that the Ohio

business could become EMS's customer.

On June 23, 2011, Debtor formed Jet Products, LLC ("Jet Products") in Kentucky, which

acquired the assets of the Ohio business.   On August 1, 2011, Jet Products closed on a $541,000

SBA loan that HNB also funded, which covered a portion of the purchase price of the Ohio

company's assets.   Debtor personally guaranteed this SBA loan as well.   Debtor and Mr. Dome

each contributed $35,000 toward the acquisition of the Ohio company's assets.   Debtor obtained

a 40% membership interest in Jet Products, while Messrs. Dome and O'Rourke obtained 30%

interests.   Jet Products continued the operations of the Ohio company after acquiring its assets.

Mr. O'Rourke ran Jet Products' day-to-day operations.    Debtor prepared and filed Jet Products'

tax returns.    Mrs. Roy was the bookkeeper for Jet Products.    Ultimately, however, EMS could

not make the volume of parts that Jet Products needed as originally anticipated.

After the Jet Products acquisition and EMS's subsequent default on the SBA loan and the

Notes, Debtor informed Mr. O'Rourke that HNB was going to repossess EMS's assets.    On

December 7, 2011, Mr. O'Rourke formed Autumnwood Capital, LLC ("Autumnwood") in

Kentucky as a holding company.    Mr. O'Rourke owns a 90% interest in Autumnwood, along

with two other 5% members.    Debtor is not a member of and has no ownership interest in

Autumnwood, though he prepares and files tax returns for Autumnwood and Mrs. Roy was the

office manager and bookkeeper for Autumnwood.    Autumnwood, in turn, formed an entity

called Elite Machining LLC ("Elite Machining") on December 9, 2011.

HNB sued EMS in early 2012 to foreclose on its SBA loan, and obtained a judgment in

its favor.    In March 2012, HNB sold the former EMS assets to Autumnwood for $103,590 by

way of a Secured Party Bill of Sale.    Elite Machining operates the machine shop assets that

Autumnwood purchased from HNB.    Jet Products obtained some of the parts it required to

manufacture its products from Elite Machining.[3]    By the time of trial, however, Jet Products no

longer existed.

**C.    HIJ's Lawsuit against Debtor, and Debtor's Transfer of a GMC Sierra into Joint
Ownership with his Wife.**

Mr. O'Brien became aware that EMS had defaulted on its SBA loan, and also came to

learn that EMS's assets had been foreclosed upon, repossessed and sold, after a new entity (Elite

Machining) began paying rent for the space where EMS had operated its shop.    Ultimately, HIJ

---

[3] Plaintiff elicited testimony from Debtor and Mrs. Roy regarding two other corporate entities, Crisscrossed
Connections, Inc. and Bullfrog Industries LLC.    To the extent the testimony was relevant, it essentially confirmed
that Debtor and Mrs. Roy obtained these entities after Debtor filed his bankruptcy petition, and Crisscross
Connections was linked to a potential plan to fund a settlement of HIJ's state court judgment against Debtor.

filed "a Complaint for Collection of a Debt" against Debtor in Kentucky state court in November

2014 to collect on his guaranties of the Notes, and obtained a summary judgment against Debtor

on April 20, 2015.    The court awarded HIJ (i) $34,991.31 plus interest at a rate of seven percent

(7%) from September 11, 2011, until paid in full; (ii) $131,500 plus interest at a rate of six

percent (6%) from January 11, 2012 until paid in full; and, (iii) all costs and expenses incurred

by HIJ, including attorney's fees, for collection of the subject debt.    There is no evidence that, in

the state court lawsuit, HIJ obtained a determination of liability against Debtor on any matter

other than his two personal guaranties of the Notes.

When HIJ filed its lawsuit against him, Debtor owned three vehicles: (i) a 2008 Chevrolet

Silverado; (ii) a 2003 Acura; and (iii) a 1970 GMC Sierra truck.    Mrs. Roy purchased the GMC

Sierra for Debtor in the mid-1990s prior to the Roys' marriage, and it was titled in Debtor's

name when acquired.    When HIJ filed the Civil Action, both the Acura and the GMC Sierra

were titled solely in Debtor's name.

Debtor engaged attorney Kevin Palley to represent him in the HIJ lawsuit.    Mr. Palley

initially agreed to accept payment for the work from a legal insurance policy, but the insurer

ultimately declined coverage and refused to pay for Mr. Palley's services.    Mr. Palley informed

Debtor that he would need to make payment arrangements to continue the representation.

Debtor and his wife then applied for a loan with Members Heritage Federal Credit Union

("Members Heritage") in late March 2015 to finance the lawsuit, which included counterclaims

through which Debtor sought affirmative relief.    The lender required that both Debtor and Mrs.

Roy would be obligated on the loan, and the GMC and the Acura were pledged as collateral for

the loan.    Mrs. Roy testified that she felt that, if she was to be obligated on the loan, she wanted

to be added to the title on the vehicles.

Before taking steps to add Mrs. Roy to the vehicle titles, Debtor consulted with Mr.

8

Palley regarding whether doing so would be a problem.   Debtor did not advise Mr. Palley that

the GMC had been purchased before the marriage, but stated that Mr. Palley told him that

transferring the titles would not be an issue.   Mr. Palley testified that he advised Debtor that he

could not transfer assets to prevent collection efforts on those assets.   He also told Debtor that

because the vehicles were marital property, Mrs. Roy already had an interest in them and there

would be no issue with adding her name to the titles—though the vehicles could not be titled

solely in her name.

Accordingly, on April 13, 2015, while the HIJ lawsuit was pending but before the court

entered the order granting summary judgment, Debtor and Mrs. Roy applied to have both the

Acura and the GMC Sierra retitled jointly.   On April 15, the Department of Motor Vehicles

issued a new title for the Acura, titling it jointly between Debtor and Mrs. Roy.   On May 4,

2015, the Department of Motor Vehicles issued a new title for the GMC Sierra, titling it jointly

between Debtor and Mrs. Roy.   The vehicles were pledged to Members Heritage to secure a

loan on May 16, 2015.

After the state court granted HIJ a summary judgment, HIJ asked Debtor how he would

satisfy the judgment.   The parties offered conflicting testimony on communications thereafter.

Mr. O'Brien testified that Debtor "told us in no uncertain terms he would not pay and would

pursue bankruptcy;" Debtor testified to efforts made to compromise with HIJ regarding

satisfaction of the judgment, including monetary offers made on specific payment terms, and Mr.

Palley corroborated that settlement was discussed.   Mr. O'Brien testified that, following entry of

the state court judgment, HIJ attempted to attach and collect on the GMC Sierra, but learned that

it had been "titled in a different name."

Debtor filed his chapter 7 petition on June 18, 2015, naming HIJ as a creditor, and filed

his schedules on June 30, 2015.   Debtor reported a one-half ownership interest in the GMC

Sierra, owned jointly with his wife, on Schedule B of his Petition, and listed the lien thereon,

securing a $15,000 debt, on Schedule D.   Mr. Roy did not list the transfer of the 1970 GMC

Sierra into joint name with his wife on his initial Statement of Financial Affairs.   This was

added to an Amended Statement of Financial Affairs as: "1/2 interest of 2003 Acura and 1970

Chevrolet [*sic*].   Ms. Roy signed the note with Members Heritage on loans on these vehicle[s]."

[Ch. 7 Case No. 15-51217, ECF No. 19 at 4.[4]]

## RELEVANT PROCEDURAL BACKGROUND

**A.     Debtor's Petition, HIJ's Complaint, and Debtor's Motion to Dismiss.**

HIJ filed a Complaint against Debtor on September 10, 2015 to initiate this adversary

proceeding.   In its Complaint, HIJ alleges that Debtor took actions to avoid full payment by

EMS to HIJ of the two Notes that EMS gave HIJ when HIJ sold the Assets to EMS.   HIJ asserts

that Debtor, "through [his] willful and malicious actions to avoid payment of the Notes,

voluntarily and intentionally caused injury to the property of Plaintiff in violation of 11 U.S.C. §

523(a)(6)."   [ECF No. 1 at ¶ 39.]

In addition, HIJ seeks to deny Debtor his chapter 7 discharge under § 727(a)(2).   HIJ

alleges that, after HIJ brought suit against Debtor in the Fayette Circuit Court to enforce his

personal guarantees on the Notes and obtained a judgment against him on April 20, 2015, Debtor

represented that "he had no intentions of paying the [HIJ] Judgment" and took action to transfer

title of the GMC Sierra from his sole name into joint title with his wife to prevent HIJ from

executing on the vehicle to collect on its judgment.   [ECF No. 1 at ¶¶ 43-48.]   HIJ asserts that

"[t]he transfer of the title to the GMC [was] made with the intent to hinder, delay or defraud a

creditor."   [*Id*. at ¶¶ 54-55.]

---

[4] Federal Rule of Evidence 201 permits the Court to take judicial notice of its own court records.   *See, e.g.*, *In re Ludwick*, 185 B.R. 238, 240 n.3 (W.D. Mich. 1995).

Shortly after HIJ filed the Complaint, the Court entered its first Order for Trial on

September 16, 2015.   The Court set December 8 as the deadline to complete discovery and

scheduled a trial for January 26, 2016.

Debtor filed an Answer on October 14, 2015, and, on December 1, moved to dismiss this

proceeding.   After two rounds of briefing and an oral argument, the Court denied the motion.

**B.      Pre-trial Activity after the Denial of Debtor's Motion to Dismiss.**

After the Court denied Debtor's motion to dismiss, the parties conducted discovery, and

the Court reset the discovery and trial deadlines several times.   On March 23, 2016, the Court

issued an Amended Order for Trial, giving the parties until June 7 to complete discovery and

setting a trial for July 26.   Thereafter, HIJ served sets of interrogatories on Debtor on April 6

and April 28, and then served interrogatories, a request for admissions, and a request for

documents on May 27.   The Court issued its Second Amended Order for Trial on June 9, 2016,

which set the discovery deadline for July 12 and scheduled trial to be held on August 30.   A few

weeks later, the Court entered a Third Amended Order for Trial, extending the discovery

deadline to July 26.   HIJ then served additional interrogatories and requests for documents.

On August 5, 2016, Debtor moved for summary judgment on both claims, leading the

Court to vacate the August 30 trial date.   After briefing and argument, the Court denied this

motion on August 30, and on the same day issued its Fourth Amended Order for Trial.   The

discovery deadline having passed on July 26, the Court did not set a new discovery deadline.

Rather, the Court set a trial for October 4, 2016.

On September 13, 2016, seven weeks after the close of discovery and three weeks before

trial, HIJ filed a motion to compel against Debtor, seeking a hearing on short notice on

September 15.   HIJ reported that its counsel had reviewed Debtor's responses to the four sets of

discovery served on him and "has determined that his responses are not adequately responsive to

11

its request[s]."   [ECF No. 94.]   The next day, however, HIJ withdrew its motion to compel, and

the parties tendered a proposed Agreed Order, which the Court entered, stating that HIJ "may

supplement the record with bank records for [EMS] and Jet Products, LLC after the September

20, 2016 deadline for filing additional exhibits."   [ECF No. 98.]

## C.    The trial

The parties appeared at trial on October 4, 2016.   HIJ called five witnesses: (i) Jeffrey S.

O'Brien, a principal of HIJ; (ii) Debtor; (iii) William O'Rourke, a principal of Jet Products, LLC,

Autumnwood Capital, LLC, and Elite Machining, LLC; (iv) Kevin Palley, Esq., Debtor's former

legal counsel; and (v) Mark Enderle, CPA, HIJ's expert witness.[5]   Debtor offered additional

testimony in his own defense, and also elicited testimony from the following: (i) Karen Roy, his

wife; (ii) Fred Doster, a business broker; (iii) Norman Roy, his father; and (iv) William Dray, a

former EMS employee.[6]

Mr. Endlerle, the sole expert witness testifying at trial, stated that he looked at the

financial documents available to him, which included certain bank statements and tax returns,

but also advised that he did not have all of the records he wanted to review, including EMS

accounting records or QuickBooks files.   While Mr. Endlerle discussed certain observations

regarding the records he reviewed, including checks written and other financial transfers that he

did not understand, he did not offer persuasive expert testimony bearing on the question of

whether Debtor willfully and maliciously injured HIJ's property by preventing EMS from paying

---

[5] On the day before trial, Debtor filed a motion *in limine* to exclude Mr. Enderle's testimony and report.   On the morning of trial, Debtor clarified that he objected to the introduction of Mr. Enderle's expert report as an exhibit, but stated that he did not object to Mr. Enderle testifying at trial and did not object to Mr. Enderle testifying about bank records.   The Court permitted Mr. Enderle to testify.

[6] On the day before the trial, the parties tendered an Agreed Order, which the Court entered, providing that "the parties may supplement the record with the deposition testimony of Robert Fleming after the October 4, 2016 hearing date."   [ECF No. 110.]   At the close of the evidence, the parties advised that they no longer saw a need to depose Mr. Fleming and tender his transcript for the Court's consideration.

on its Notes.    The most pertinent opinion he offered was that it is not normal for a business to

increase officer compensation when losing revenue.    On cross-examination, Mr. Enderle

acknowledged that higher sales figures do not equate to increased profits, and that multiple

decisions made by business owners or other factors can impact profitability.    Moreover, with

regard to several of the checks and transfers that Mr. Enderle questioned, Debtor explained the

nature of the transfers and his explanations were not impeached.

HIJ successfully moved to admit several, but not all, of the exhibits discussed at trial.

For example, HIJ did not move to admit any of the bank records that Mr. Enderle discussed

during his examination.    Debtor did not move any exhibits into evidence.    Both parties stated

that they had closed their proof.

### D.    Post-trial Activity.

On October 10, 2016, HIJ moved to reopen proof.    HIJ asserted that it wished to

supplement the record with bank records, described as "evidence that was unavailable at the time

of trial due to Debtor's failure to cooperate with discovery."    [ECF No. 119.]    HIJ also advised

that it "is expecting additional evidence as more bank records become available and will move to

supplement the record with such evidence as it becomes available."    [*Id*.]    Debtor responded to

the motion to state that "he has no objection to these particular documents being entered in the

record."    [ECF No. 121.]    In reply, HIJ averred that "it would like the opportunity to introduce

this evidence and other financial documents, as they become available, through the testimony of

its expert witness, Mark G. Enderle."    [ECF No. 123.]

At the motion hearing, HIJ asked the Court to reopen the trial to permit Mr. Enderle to

testify.    Debtor objected to reopening the trial to take further proof and to allowing HIJ to

continue to supplement the record.    The Court granted HIJ the opportunity to provide legal

authority to support its motion by October 20.    [ECF No. 125.]    On October 21, HIJ submitted a

supplemental memorandum via a "Motion to Accept Late Filing," advising that HIJ "attempted

to file its Motion after 5pm on October 20, 2016, however, due to technical difficulties, counsel

was not able to access the ECF website to electronically file the attached Memorandum."   [ECF

No. 126.]   Debtor objected to the untimely filing, and also argued that HIJ "could have asked for

a continuance at trial but did not choose to do so," and requested that "the evidence be closed

and this Court issue a judgment."   [ECF No. 127.]

## JURISDICTION

This Court has jurisdiction of this matter.   28 U.S.C. § 1334(b).   The allegations against

Debtor are core proceedings about which this Court is authorized to enter final orders.   28

U.S.C. § 157(b)(2)(I) and (J).   Venue is proper.   28 U.S.C. § 1409.

## ANALYSIS

**I.    Plaintiff has Failed to Carry its Burden to Demonstrate an Entitlement to Relief under § 523(a)(6).**

Count I of HIJ's Complaint seeks a determination that the debt Debtor owed to HIJ is

non-dischargeable under § 523(a)(6), which excepts from discharge "any debt . . . for willful and

malicious injury by the debtor to another entity or to the property of another entity."   11 U.S.C.

§ 523(a)(6).   Exceptions to discharge are narrowly construed in the debtor's favor.   *In re*

*Zwosta*, 395 B.R. 378, 382-83 (B.A.P. 6th Cir. 2008).   HIJ had the burden to prove by a

preponderance of the evidence that Debtor engaged in willful and malicious conduct that resulted

in injury to HIJ or its property.   As the Bankruptcy Appellate Panel for the Sixth Circuit stated:

> To except a debt from discharge under § 523(a)(6), the alleged injury must be
> both willful and malicious.   *Markowitz v. Campbell* (*In re Markowitz*), 190 F.3d
> 455, 463 (6th Cir. 1999).   For a debt to be held willful and malicious as
> contemplated by § 523(a)(6), the act at issue must be done with the actual intent
> to cause injury.   *Id*. at 464.   The requisite intent is present when the debtor
> "'desires to cause [the] consequences of his act, or ... believes that the
> consequences are substantially certain to result from it.'"   *Id*. (citation omitted).
> Section 523(a)(6) requires a debtor to commit an act akin to an intentional, rather

14

> than negligent or reckless tort. *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.
> Ct. 974, 977, 140 L.Ed.2d 90 (1998). An act is "malicious" if it is undertaken "in
> conscious disregard of one" duties or without just cause or excuse." *Wheeler v.
> Laudani*, 783 F.2d 610, 615 (6th Cir. 1986). "Malicious" acts do "not require ill-
> will or specific intent to do harm." *Id.* The party seeking to deny debtor a
> discharge bears the burden of proving both requirements by a preponderance of
> the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 661, 112
> L.Ed.2d 755 (1991).

*In re Phillips*, 434 B.R. 475, 483 (B.A.P. 6th Cir. 2010). "The burden of showing something by

a 'preponderance of the evidence' . . . 'simply requires the trier of fact to believe that the

existence of a fact is more probable than its nonexistence before [he] may find in favor of the

party who has the burden to persuade the [judge] of the fact's existence.'" *Apts. at Cambridge

Co., L.L.C. v. Lewiston (In re Lewiston)*, 537 B.R. 808, 815 (Bankr. E.D. Mich. 2015) (citations

omitted).

Given the parties' stipulations, the pertinent remaining issues for trial with regard to

HIJ's claim under § 523(a)(6) were whether (1) Debtor willfully and maliciously injured HIJ or

its property, and (2) a debt owed from Debtor to HIJ arose from that willful and malicious injury.

There is no dispute that EMS issued the Notes to HIJ and, thus, that HIJ held an account

receivable from EMS, separate from Debtor's individual guaranty of the Notes.

HIJ's theory of the case is that Debtor devised and executed a scheme that resulted in an

intentional injury to HIJ's property, to wit, the Notes EMS owed to HIJ. The alleged injury to

HIJ is EMS's inability to pay on the Notes. Debtor allegedly caused this injury by manipulating

EMS's assets and financials so as to move the Assets away from EMS without EMS paying in

full for the Assets, while Debtor or EMS retained the benefits of the Assets.

HIJ failed to adduce evidence sufficient to carry its burden on this claim. HIJ did not

establish that Debtor carried out an intentional scheme to injure HIJ by causing EMS to be

unable to meet its obligations to HIJ under the Notes. Rather, the great weight of the evidence

and testimony presented leads the Court to conclude that Debtor expended significant resources and pursued several reasonable paths in an effort to prevent EMS's demise, but his efforts were unsuccessful.

The evidence shows that Debtor was a first-time business owner who invested $70,000 cash in a new business and took on significant debt via personal guaranties.   EMS lost its biggest client shortly after commencing business operations, and thereafter Debtor devoted significant time and effort to put EMS on better footing.   Debtor's business partner in EMS, Mr. Fleming, fell ill after the pair started operating the business, and because a disability insurance policy had lapsed, EMS faced additional challenges.   Debtor left a well-paying position and took a new job out-of-state, far from his home and family, so that EMS could bid for work from Nestle.   Debtor investigated and pursued other options to sustain EMS's business to no avail and, ultimately, EMS failed, exposing Debtor to sizeable personal liability.   While an entity owned by Debtor's business partner in Jet Products came to acquire EMS's assets after HNB foreclosed on them, the undisputed testimony from Mr. O'Rourke and Debtor was that Debtor has no interest of any nature in that purchaser, Autumnwood.   There was no evidence presented that Debtor benefited in any tangible way from the foreclosure process and subsequent sale of assets to Autumnwood, or that there was anything amiss in HNB acquiring the assets for resale through the court-supervised foreclosure process.

Although Mr. O'Brien considered it unreasonable and suspicious for EMS to operate differently than HIJ did under his leadership in terms of the kind of business it would pursue (custom-built vs. bulk machine parts), the evidence does not reflect that Debtor (and/or Mr. Fleming) adjusted the EMS business plan to willfully and maliciously injure HIJ.   Mr. Fleming's decision to advise Mr. O'Brien that his consulting services no longer were required shortly after the transition of the business does not establish that Debtor had a motive to willfully

and maliciously injure HIJ by causing EMS to fail.   In fact, the testimony from Mr. O'Brien and

Debtor reflected that Mr. O'Brien's efforts at assisting EMS's management in connection with

customer relations were not fruitful.   Although Plaintiff's expert, Mr. Enderle, discussed aspects

of tax returns, bank statements, and other financial records that raised questions in his view

regarding EMS's operations and finances, his testimony does not convince the Court that Debtor

manipulated EMS's finances or records to prevent EMS from paying on the Notes to HIJ.

        The parties stipulated that, in February 2015, after HIJ had filed the state court lawsuit

against Debtor, he loaned $30,000 to Jet Products to keep it afloat, which funds he obtained by

way of a personal loan from Members Heritage.   Debtor secured $15,000 of this loan from

Members Heritage with his 2008 Chevrolet Silverado, and the remainder of the loan was

unsecured.   HIJ apparently perceives that this conduct evidences that Debtor took steps to

preserve Jet Products while he made no similar effort to satisfy the debt EMS owed to HIJ on the

Notes.   But HIJ offers no evidence to explain how Debtor's decision to make a personal loan to

Jet Products, which occurred long after EMS defaulted on the Notes (and its SBA loan) in

September 2011, helps to establish that Debtor intentionally prevented EMS from paying on the

Notes.   The Court does not agree that these loans were part of an ongoing scheme to

intentionally injure HIJ's property.

        The Court does not have doubts concerning the credibility of any of the trial witnesses,

yet finds the testimony of William Dray particularly credible with regard to Plaintiff's §523(a)(6)

claim.   Mr. Dray worked for HIJ for many years before EMS employed him, such that he had

the opportunity to observe both businesses and their principals, and Plaintiff made no effort to

impeach his credibility.   Mr. Dray confirmed that the business's biggest customer stopped

placing orders almost immediately after HIJ sold its assets to EMS, and that, even though the

EMS principals were "constantly out trying to find work" and were able to bring some work in

the door, they could not overcome the loss of this customer.

Only acts done with the intent to cause injury can cause a willful and malicious injury that permits an exception from discharge under § 523(a)(6). *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). While Debtor's decisions and actions may not have led to EMS's success, HIJ failed to establish that any of Debtor's decisions and actions were intended to undermine EMS's success, and thereby cause a willful and malicious injury to HIJ's receivable from EMS.

Furthermore, to the extent that HIJ avers that its state court judgment against Debtor established that Debtor engaged in willful and malicious conduct that resulted in injury to HIJ or its property, this is incorrect. HIJ obtained a judgment against Debtor in the state court lawsuit by enforcing Debtor's personal guaranties of the Notes—a preexisting obligation based on contract law that is not akin to intentional tort. This judgment debt resulting from a pre-existing contractual obligation is not a debt that may be excepted from discharge via § 523(a)(6) as that debt obligation did not arise from Debtor's conduct, willful or otherwise. "From the plain language of the statute, the judgment must be for an injury that is both willful and malicious. The absence of one creates a dischargeable debt." *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999). The state court judgment does not discuss any intentional scheme that Debtor may have had to prevent EMS from meeting its obligations under the Notes to HIJ, and no evidence presented at trial established that the scope of that lawsuit related to anything other than Debtor's liability to HIJ on his personal guaranties on the defaulted Notes.

## II.     Plaintiff did not Carry its Burden to Demonstrate that Debtor's Discharge should be Denied under § 727(a)(2)(A).

Count II of the Complaint seeks to deny Debtor's discharge under § 727(a)(2)(A). Courts construe this section liberally in favor of the debtor. *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir. 2000). As the party objecting to Debtor's discharge under

§ 727(a)(2)(A), HIJ must carry the burden of proof by a preponderance of the evidence.

*Buckeye Retirement Co. v. Swegan (In re Swegan)*, 383 B.R. 646, 654 (6th Cir. B.A.P. 2008).

To prevent entry of a discharge under § 727(a)(2)(A), HIJ must prove: "(1) a disposition of

property, such as concealment, and (2) a subjective intent on the debtor's part to hinder, delay or

defraud a creditor through the act disposing of the property."   *In re Keeney*, 227 F.3d at 683.

The party objecting to discharge must prove that the debtor had actual intent to deceive, but

"because of the inherent difficulties in proving intent, circumstantial evidence, including

evidence of the debtor's conduct, may be used to establish his intent."   *Ayers v. Babb (In re*

*Babb)*, 358 B.R. 343, 350 (Bankr. E.D. Tenn. 2006) (citation omitted).

The sole basis Plaintiff advanced to obtain relief under §727(a)(2)(A) was that Debtor

knowingly transferred title to an asset—a GMC Sierra truck—from his sole ownership into joint

ownership with his wife, even though it was a non-marital asset, to make it harder for Plaintiff to

collect on its judgment.   There is no dispute that there was a disposition of property by Debtor

insofar as Debtor transferred title to property he alone owned into joint ownership with his wife

within one year before he filed his chapter 7 petition.   HIJ, however, did not prove that Debtor

had the subjective intent to hinder, defraud or delay HIJ by transferring title into joint ownership

with his wife.   Debtor, Mrs. Roy, and Mr. Palley gave credible testimony, described above, that

negates HIJ's bare assertion of the requisite intent.   The Court believes Debtor's explanation of

the circumstances pertaining to the loan and the collateral involved.

While the GMC Sierra was acquired pre-marriage, and Debtor admitted that he did not

inform Mr. Palley of this when soliciting his advice, the Court is not convinced that Debtor

withheld this information from his attorney as part of a plan to hinder, defraud or delay HIJ.

Rather, Debtor and Mrs. Roy both explained that, as she would co-sign on the loan, and the two

vehicles were to be pledged as collateral, she wished to have joint title to the vehicles.   Debtor

19

sought legal advice regarding the issue before seeking to transfer title to the vehicles—and

Debtor and Mrs. Roy submitted the transfer applications *before* the state court entered judgment

against Debtor.   The Court finds credible Mrs. Roy's stated desire to have joint title to the cars

to be pledged as collateral in connection with a loan on which she would be obligated personally.

In addition, Debtor testified that he attempted to reach settlement terms with HIJ on the

judgment after its entry.   Debtor and Mrs. Roy discussed obtaining funds to pay HIJ in

connection with the acquisition of Crisscrossed Connections.   Debtor testified that he made an

offer to pay HIJ $75,000 on its judgment.   Such conduct contradicts the theory that Debtor

transferred a vehicle, worth substantially less than the settlement amount offered to HIJ, to avoid

collection efforts by HIJ—on a judgment HIJ had not yet received when Debtor and Mrs. Roy

submitted the transfer applications.

**III.    HIJ's Motion to Re-open the Trial is Denied.**

Notwithstanding Debtor's objection to HIJ's late submission of authority relating to its

motion to reopen proof, the Court will address HIJ's motion on the merits.

Bankruptcy Rule 9023 adopts Civil Rule 59.   Civil Rule 59(a)(2) provides: "After a

nonjury trial, the court may, on motion for a new trial, open the judgment if one has been

entered, take additional testimony, amend findings of fact and conclusions of law or make new

ones, and direct the entry of a new judgment."   FED. R. CIV. P. 59(a)(2).   The Court has

discretion when deciding a motion to reopen a trial to submit additional evidence.   *Zenith Radio

Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331 (1971); *Noble v. National Mines Corp.*, 774

F.2d 144, 149 (6th Cir. 1985).   "[I]n deciding such a motion, a court should be concerned with

several factors: what burden will be placed on the parties and their witness, what undue prejudice

may result by not admitting the new evidence, and what consideration should be given to judicial

economy."   *Shearer v. Oberdick (In re Oberdick)*, Ch. 7 Case No. 08-20434, A.P. No. 08-2155,

2013 Bankr. LEXIS 1180, at *6-7 (Bankr. W.D. Pa. Mar. 26, 2013) (citing *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 891, 894 n.6 (3d Cir. 1975)).

HIJ filed this adversary proceeding on September 10, 2015, and it was not tried until over a year later.   The parties had the opportunity to conduct discovery over the course of several months, and the discovery period closed on July 26, 2016.   It was not until well after the close of discovery, after the Court denied Debtor's motion for summary judgment on HIJ's claims, and three weeks before the fourth scheduled trial date, that HIJ moved to compel Debtor to produce records HIJ deemed necessary to its case.   [ECF No. 94.]   In fact, HIJ then withdrew its motion the following day, opting not to present its concerns to the Court before the trial regarding the Debtor's document production.   [ECF No. 96.]

"As with Rule 59(e), any proposed supplemental evidence offered under Rule 59(a)(2) must be newly discovered."   *Patel v. Patel (In re Patel)*, 551 B.R. 488, 494 (Bankr. D.N.M. 2016).   While HIJ argues that Debtor failed to produce the records HIJ requested, and then failed to execute certain authorizations permitting HIJ to obtain those records itself, HIJ does not explain its own delay in pursuing the evidence it perceived it would need to support its claims before the close of the discovery period, or why it did not move to compel Debtor to provide the financial records or authorization HIJ demanded within the discovery period.   The Court does not consider the unidentified "financial documents" to be "newly-discovered evidence" solely because HIJ did not successfully obtain such evidence during the discovery period.

Moreover, HIJ's request to introduce unidentified "financial documents" through Mr. Enderle "as they become available" is not well-taken.   In effect, HIJ asks to continue the trial indefinitely, so long as it keeps locating additional pertinent records.   HIJ offers no authority to support this aspect of its request.   Proceeding in this fashion would be inherently burdensome on the Court and the parties, and certainly does not advance judicial economy.   In addition, the

Court believes HIJ's introduction of "financial documents" through Mr. Enderle would lead

Debtor to seek to elicit additional testimony to explain those records, further extending the trial.

 HIJ's failure to assess its evidentiary needs during the discovery period contradicts a

finding that it will suffer undue prejudice if this motion is denied.   The parties had ample time to

complete discovery, moved several times for a continuance of trial, and ultimately conducted a

trial on October 4, 2016.   Both parties stated that they closed their evidence at the end of the

trial.   The Court will not exercise its discretion to re-open the trial given the circumstances

presented.

## <u>CONCLUSION</u>

 During the trial, Mr. O'Brien, HIJ's principal, testified that he felt that Debtor cheated

and manipulated him.   He explained that he had "handed" Debtor and Mr. Fleming "a very

profitable company" and they inexplicably changed the business model when they took over the

company.   He perceived that there must have been "some motivation" to do this.   While the

Court recognizes Mr. O'Brien's subjective perceptions and frustration at not being paid on the

Notes, HIJ did not carry its burden to prove the elements of either of its causes of action by a

preponderance of the evidence.

 The foregoing constitutes the Court's findings of fact and conclusions of law in

accordance with Bankruptcy Rule 7052.   In reaching the conclusions found herein, the Court

has considered all of the evidence, exhibits, and arguments of counsel, regardless of whether or

not they are referred to specifically in this Memorandum Opinion and Order.

 The Court hereby ORDERS as follows:

 1. HIJ's Motion to Reopen Proof [ECF No. 119] is DENIED.

 2. A Judgment in Debtor's favor dismissing Plaintiff's claims with prejudice shall be

entered.   As the prevailing party, the Court finds that Debtor is entitled to recover its costs of

suit from Plaintiff, which Debtor demanded in its Answer.   [ECF No. 7.]   Debtor may submit a

bill of costs.   FED. R. BANKR. P. 7054(b)(1).

23

The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and
electronically entered by the Clerk in the official record of this case.



Signed By:
*Tracey N. Wise*
**Bankruptcy Judge**
**Dated: Thursday, January 26, 2017**
**(tnw)**